STATE OF CONNECTICUT *v.* OSCAR MARTINEZ DEJESUS
(11499)

HEALEY, PARSKEY, GRILLO, ARMENTANO and F. HENNESSY, Js.

 

Argued May 11—decision released September 4, 1984

*Sydney T. Schulman,* with whom, on the brief, was *William P. Lane,* legal assistant, for the appellant (defendant).

*David S. Shepack,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Warren Maxwell* and *Carl Schuman,* assistant state's attorneys, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was convicted by a jury of two counts of manslaughter in the first degree in violation of General Statutes § 53a-55 (a). On appeal, he claims that the trial court erred in admitting into evidence three black and white photographs of the victims taken at the scene of the crime and in its charge to the jury on the issue of self-defense.[1]

---

[1] The excuse of self-defense is codified in General Statutes § 53a-19: "USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless

The jury could reasonably have found the following facts: The defendant resided at 209 Barbour Street, Hartford. The victims, Carmen Martinez and Jorge L. (Luis) Martinez, Sr.,[2] lived at the rear of 209 Barbour Street. The defendant was the brother of Luis Martinez, and Carmen Martinez was Luis' wife. Over the years, recurrent problems had arisen between the defendant and his brother.

On July 17, 1980, the defendant returned home from work at about 4 p.m. and parked his pickup truck on the street. Later, at approximately 9 p.m., he moved the truck off the street into the parking area behind 209 Barbour Street. An argument, instigated by Luis, then ensued between him and the defendant. At that point, Luis and Carmen Martinez were sitting on their

the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[2] The male victim was also known as Luis Martinez and at trial he was referred to as "Luis." Several witnesses also testified that the male victim was known as "Luis El Loco," or Crazy Luis, in the Hispanic community. Hereinafter, we shall refer to the male victim as "Luis Martinez."

second floor porch. During their argument, the defendant, by his own admission, challenged Luis to a fight. Luis, armed with a machete, descended the stairs to the parking area where he struck the defendant's left arm with the machete. The defendant retreated to the fence located at the south side of the parking lot, where he picked up an iron pipe.[3] By this time, Carmen Martinez, also armed with a machete, had descended to the parking area. Using the pipe as a weapon, the defendant first struck a blow to the head of Luis, who dropped his machete and fell to the ground. Then Carmen charged the defendant who, in response, also struck her on the head with the pipe. Carmen fell to the pavement alongside her husband. According to the opinion testimony of the state's chief medical examiner, the two victims were probably not killed by that first blow inflicted on each of them. The first blow to each of the victims inflicted by the defendant caused them to drop their machetes and fall to the ground. The defendant continued to strike the victims with alternating blows of the pipe for approximately three to five minutes. Both victims died as a result of the injuries received from the blows.[4]

When a police officer arrived at the scene, the defendant, holding the pipe over his head, walked down the driveway and surrendered to the officer. Later that eve-

---

[3] Testimony at trial indicated that the defendant had retreated and obtained the pipe subsequent to the initial attack upon his person by Luis. In his original statement given the night of the incident, however, the defendant indicated that he first picked up the iron pipe while Luis was descending from the porch. According to that account, the defendant had possession of the iron pipe upon his initial encounter with Luis, who was also armed with the machete. At trial, the defendant recanted this part of his earlier statement.

[4] The cause of death of Luis Martinez was certified as resulting from skull fractures with lacerations of the brain, multiple rib fractures, lacerations of the liver, and contusions of the lungs. Carmen Martinez' cause of death was certified as resulting from a skull fracture with contusions of the brain, and rib fractures with lacerations of the heart and liver.

ning, the defendant provided a voluntary statement to the Hartford police in which he admitted striking the victims repeatedly with the pipe. The defendant was indicted on two counts of murder in violation of General Statutes § 53a-54a (a) and (c). He claimed the defenses of extreme emotional disturbance and self-defense. The jury returned a verdict of guilty of manslaughter in the first degree due to extreme emotional disturbance on both counts. The defendant received a total effective sentence of not less than fifteen years nor more than thirty years.

## I

The defendant first claims that the trial court erred in admitting certain photographs into evidence over his objection. The exhibits in question were three eight inch by ten inch black and white photographs depicting the victims as they were found at the scene on the night of July 17.[5] One photograph depicts primarily the injuries suffered by the female victim who appears in the foreground of the photograph. Another photograph shows the injuries to the female victim from a different angle and it also shows some of the injuries to the male victim's back. The third photograph shows the male victim in the foreground and details the injuries to his head and back. Visible in all three photographs is a machete under the right leg of the male victim.

The defendant contends that any relevance of these photographs was outweighed by their prejudicial effect. The photographs, according to the defendant, were gruesome, inflammatory, and highly prejudicial in nature. The defendant also claims that since he offered to admit "every fact" which could be proved by their admission, they were cumulative in nature and cannot

---

[5] Prior to admission into evidence, each photograph was identified by the detective who took it as a fair and accurate representation of the appearance of the victims as they were found at the crime scene.

be said to serve any "essential evidential value" which must be demonstrated for their admission into evidence.

Photographs of a victim taken at the scene of a homicide are not per se inadmissible. The rule in this state on the admissibility of photographic evidence has been well established: " 'The great weight of authority is that photographs, even though gruesome, are admissible in evidence when otherwise properly admitted if they have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. Note, 73 A.L.R.2d 769, 787. A photograph, the tendency of which may be to prejudice the jury, may be admitted in evidence if, in the sound discretion of the court, its value as evidence outweighs its possible prejudicial effect. *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223 [1952]'; *State* v. *LaBreck,* 159 Conn. 346, 351, 269 A.2d 74 (1970); *State* v. *Smith,* 174 Conn. 118, 122, 384 A.2d 347 (1977)." *State* v. *Haskins,* 188 Conn. 432, 452–53, 450 A.2d 828 (1982); see *State* v. *Marshall,* 166 Conn. 593, 602, 353 A.2d 756 (1974). We have never adopted a requirement that potentially inflammatory photographic evidence must be found to be absolutely essential to the proof of the prosecution's case. See, e.g., *State* v. *Haskins,* supra; *State* v. *Bember,* 183 Conn. 394, 407–408, 439 A.2d 387 (1981). "[T]he test for determining the admissibility of the challenged evidence is relevancy and not necessity. *State* v. *Piskorski,* 177 Conn. 677, 701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)." *State* v. *Haskins,* supra, 453.[6] Upon a defendant's objection, the prosecution must show that the pho-

---

[6] Under an "essential evidence" standard, when photographic evidence depicts certain scenes likely to inflame the passions of the viewer, the test in determining the admissibility of that evidence is whether it is of such evidential value that its need clearly outweighs the likelihood of any prejudicial effect; if the photographic evidence is relevant, it is admissible *only* if it is necessary to prove the issue for which it is offered. E.g., *Common-*

tographic evidence offered is relevant to its case. The trial court can then admit the evidence as long as its probative value outweighs any prejudicial effect.[7] "The trial court exercises a broad discretion in admitting such evidence, and its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown. *State* v. *Piskorski,* 177 Conn. 677, 700–701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Smith,* [174 Conn. 118, 123, 384 A.2d 347 (1977)]." *State* v. *Bember,* supra, 408. We find no such abuse of discretion in this case.

The defendant's objection that the probative value of the photographs was outweighed by their prejudicial impact was fully argued before the trial court. In exercising its discretion, the trial court found that the photographs were relevant and material to the intent element of the murder charges, to the corroboration

*ealth* v. *Powell,* 428 Pa. 275, 241 A.2d 119 (1968); see also 3 Scott, Photographic Evidence (2d Ed.) § 1231.

We note that in Pennsylvania, where the essential evidence standard has been followed; e.g., *Commonwealth* v. *Schroth,* 479 Pa. 485, 388 A.2d 1034 (1978); *Commonwealth* v. *Garrison,* 459 Pa. 664,331 A.2d 186 (1975); the Pennsylvania Supreme Court appears to be retreating from a rigid application of the rule. See *Commonwealth* v. *McCutchen,* 499 Pa. 597, 454 A.2d 547 (1982) (in murder prosecution, in conjunction with pathologist's testimony, photographic evidence depicting six-year-old victim's injuries was admissible to establish sodomy as a motive for the killing and to show brutality supporting an inference of an intent to kill). We specifically decline the defendant's invitation to adopt the essential evidence standard as the rule in Connecticut.

[7] It is worth noting that when dealing with so-called "gruesome" photographs, the modern view is that they should be considered in an objective, rather than a subjective, light. See 3 Scott, Photographic Evidence (2d Ed.) § 1231. "Where . . . much of 'the evidence in a case is such as to indicate that a crime was committed with extreme atrocity and violence, photographs, regardless of their gruesomeness, can add little to inflame or prejudice the jury.' 3 Scott, Photographic Evidence (2d Ed.) § 1231." *State* v. *Piskorski,* 177 Conn. 677, 702, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). In any event, trial judges and prosecutors must be objective when dealing with such evidence in front of the jury and should refrain from overemphasizing or displaying disgust in handling these photographs. 3 Scott, supra, § 1231.

of testimony of other prosecution witnesses, and to the amount of force exerted by the defendant in relation to his assertion of a self-defense claim. The trial court never specifically found that the photographs in question were in fact gruesome or inflammatory. Implicit in the court's admission of these exhibits was a finding that their value as evidence outweighed any prejudicial effect they might have had on the jury.

We have examined the three photographs of the victims and agree with the trial court that they were relevant to the issues presented in the case. The defendant was charged with two counts of murder in violation of General Statutes § 53a-54a (a) and (c). As the trial court properly observed, the photographs were relevant and probative on the issue of intent, an element of the murder charges on which the state had the burden of proof beyond a reasonable doubt. General Statutes § 53a-54a (a); see, e.g., *State* v. *D'Antuono,* 186 Conn. 414, 422, 441 A.2d 846 (1982). "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct. . . ." General Statutes § 53a-3 (11). Accordingly, we have recognized that "intent" is ordinarily proven through circumstantial evidence: " 'Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death.' *State* v. *Zdanis,* [182 Conn. 388, 396, 438 A.2d 696 (1980)]; see, e.g., *State* v. *Holley,* [174 Conn. 22, 26, 381 A.2d 539 (1977)]; *State* v. *Bzdyra,* 165 Conn. 400, 404–405, 334 A.2d 917 (1973); *State* v. *Litman,* 106 Conn. 345, 352–53, 138 A. 132 (1927). These inferences are necessary because the direct evidence of the accused's state of mind is

rarely available. See *State* v. *Rodriguez,* 180 Conn. 382, 404, 429 A.2d 919 (1980); *State* v. *Bzdyra,* supra, 403." *State* v. *D'Antuono,* supra, 423.

Here, the photographic evidence was relevant also to the cause and manner of the death of the two victims. These photographs served to illustrate and corroborate the testimony of the chief medical examiner and other witnesses as to the nature, severity and length of time force was inflicted upon the victims. *State* v. *LaBreck,* 159 Conn. 346, 351, 269 A.2d 74 (1970). The extent of the force exerted against the victims was inferable from the photographs themselves. They were probative on the issues of extreme emotional disturbance and self-defense as they constituted evidence which supported the state's claim that substantial force continued to be exerted against the victims after the necessity for self-defense had ceased.[8] We, therefore, disagree with the defendant's position that, in light of other evidence presented at trial, the only probative value these photographs held was to illustrate "the length of the beating by showing the battered condition of the victims' heads," and we conclude that the trial court could reasonably have found that any possible prejudicial effect created by the photographs was outweighed by their probative value.

The defendant further contends that this photographic evidence was merely cumulative of other testimony given at trial or of facts that he either had admitted or was willing to admit if the photographs were excluded. He argues that photographs of this

---

[8] At trial, the defendant, while conceding that the depiction of the machete in all three photographs reinforced his claim of self-defense, nevertheless, was willing to forego that probative weight if the trial court would exclude this photographic evidence. Such a waiver was of little import, however, in view of the probative value which the photographs had relating to the state's burden of disproving self-defense beyond a reasonable doubt. See General Statutes § 53a-12 (a).

nature are of minimal probative value where they are cumulative of other evidence presented and, therefore, such evidence should be excluded.

We have previously noted that such photographs have been properly admitted in homicide prosecutions regardless of claims that the photographs constitute merely cumulative evidence. *State* v. *Bember,* supra, 408 n.5; *State* v. *Piskorski,* supra, 701; *State* v. *Hanna,* 150 Conn. 457, 461, 191 A.2d 124 (1963); see also 3 Wharton, Criminal Evidence (13th Ed. Torcia) § 637; annot., 73 A.L.R.2d 769, 807–809. Again, the test to be applied to the admissibility of photographic evidence is whether it is relevant and then whether its probative value outweighs its prejudicial effect. See, e.g., *State* v. *Haskins,* supra, 452-53. " 'It cannot be doubted that to offer wholly irrelevant evidence of a gruesome character merely to inflame the members of the jury would be indefensible and intolerable. "On the other hand the prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." ' *State* v. *Piskorski,* supra, 701–702." *State* v. *Bember,* supra, 408. In the present case, however, the photographic evidence possessed not only corroborative value to the state's case but also independent probative value on the issues of self-defense and the defendant's intent to kill.[9]

---

[9] The defendant attempts to distinguish our decisions in *State* v. *Smith,* 185 Conn. 63, 441 A.2d 84 (1981), and *State* v. *Bember,* 183 Conn. 394, 439 A.2d 387 (1981), on the grounds that those cases involved the admission of a single autopsy photograph depicting a cleansed body in a clinical setting, as opposed to multiple crime scene photographs. The defendant's focus here is misplaced, however. The test in *Smith* and *Bember* went to the relevancy of the photographs to the issues at trial rather than to any "sterilized" depiction of the victims. *State* v. *Smith,* supra, 87–88; *State* v. *Bember,* supra, 407-408. Moreover, we have often allowed crime scene photographs of homicide victims to be admitted into evidence. *State* v. *Piskorski,* 177 Conn. 677, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62

The defendant also contends that because both counsel stipulated in the presence of the jury to the voluntariness of the defendant's confession given on the night of his arrest and in that statement he admitted to striking both victims repeatedly with a pipe, the prejudicial effect of the photographs was too great to overcome the balancing test in favor of admissibility. At trial, however, the defendant claimed self-defense while denying that the photographs were probative on the issue of his intent to kill. The defendant did not offer to admit the element of "intent." In effect, he offered to admit only what the photographs visually depicted, but not any reasonable inferences that could be drawn therefrom. Moreover, although the defendant's confession was admitted into evidence pursuant to counsels' stipulation, that stipulation went only to the voluntariness of the confession. The defendant retained the right to challenge the accuracy of his confession, a right which he exercised during his own testimony at trial. The stipulation to this defendant's confession simply cannot preempt the state from proving each element of the crimes charged with the most convincing evidence. *State* v. *Bember,* supra, 408; *State* v. *Piskorski,* supra, 701–702. Accordingly, the trial court did not abuse its discretion in allowing the prosecution to introduce these three photographs into evidence.

## II

The defendant also claims error in the trial court's instruction to the jury regarding self-defense.[10] According to the defendant, the court should have instructed that the defendant may have been justified in continuing to strike the victims after they had been incapacitated if the unnecessary blows followed closely upon the incapacitating blow during the heat of the conflict

L. Ed. 2d 194 (1979); *State* v. *Conte,* 157 Conn. 209, 215–16, 251 A.2d 81 (1968), cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428 (1969).

[10] The defendant did not file a request to charge in this case.

while the defendant believed he was fighting for his life.[11] The defendant argues that the failure so to instruct the jury was harmful error because, if properly charged, the jury might well have found the defendant not guilty on the basis of the evidence presented at trial. We do not agree.[12]

[11] While the defendant cites no Connecticut case law to support his contention, he argues in effect that the defense of extreme emotional disturbance raised in this case should have been juxtaposed with a "heat of passion" jury charge on the self-defense issue. Although we have recognized "that the defense of extreme emotional disturbance is a considerably expanded version of the common law defense of heat of passion or sudden provocation"; *State* v. *Elliott,* 177 Conn. 1, 6–7, 411 A.2d 3 (1979); see also *Patterson* v. *New York,* 432 U.S. 197, 202, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); we have ruled that "[t]he defenses of extreme emotional disturbance and heat of passion are not interchangeable." *State* v. *Elliott,* supra, 4; see General Statutes § 53a-54a (a). In the present case, the jury found that, while the state had proved beyond a reasonable doubt that the defendant had not acted in self-defense within the meaning of General Statutes § 53a-19, the defendant had proved as to both charges "the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter. . . ." *State* v. *Elliott,* supra, 9.

[12] We note that the state contends that the defendant abandoned at trial his exception to the jury instructions that give rise to this issue on appeal. Immediately subsequent to the trial court's charge to the jury, defense counsel excepted and requested a "corrected instruction." A colloquy followed during which the court explained to defense counsel what it considered to be the substance of its jury instructions regarding self-defense. Defense counsel then indicated that he "completely agree[d] with the Court on that," but nonetheless said: "I would just ask that perhaps that could be clarified to the jury again." The court then explained further the substance of its charge to the jury, to which the defense counsel responded, "[a]s the Court has stated it now, I'm 100-percent happy with [it]." Ultimately, the trial judge ruled that no further instruction would be issued but that the exceptions of the defendant were "duly noted."

A reasonable interpretation of the record before us of this colloquy is that the defense counsel agreed only with the clarification provided to him by the trial court of its charge. The court, however, refused to give any further clarifying instructions to the jury. The trial court thus received notice of the defendant's exceptions to the charge as originally stated and, in fact, recognized the exception thereto. See *State* v. *Miller,* 186 Conn. 654, 658, 443 A.2d 906 (1982); *State* v. *Willin,* 177 Conn. 248, 256, 413 A.2d 829 (1979). We find, therefore, that the defendant had not abandoned his excep-

"We have said that '[a] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974). This fundamental constitutional right includes proper jury instructions on the elements of self defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. See General Statutes § 53a-12 (a).' *State* v. *Miller,* 186 Conn. 654, 660–61, 443 A.2d 906 (1982)." *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982).

The standard of review to be applied on this constitutional claim is whether " 'it is reasonably possible that the jury were misled.' " *State* v. *Corchado,* supra. " 'The charge is to be read as a whole and individual instructions are not to be judged in "artificial isolation" from the overall charge. *State* v. *Reed,* 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Mullings,* 166 Conn. 268, 274–75, 348 A.2d 645 (1974).' *State* v. *Estep,* 186 Conn. 648, 652, 443 A.2d 483 (1982)." *State* v. *Maturo,* 188 Conn. 591, 599, 452 A.2d 642 (1982); see also *State* v. *Corchado,* supra, 660–61.

General Statutes § 53a-19, in subsection (a), provides in part, subject to the exceptions in subsections (b) and (c): "a person is justified in using reasonable physical force upon another person to defend himself . . . *from*

---

tion to the jury charge on self-defense. See Practice Book §§ 315, 854, 3060F (c) (1), (2), 3063; but cf. *State* v. *Coleman,* 167 Conn. 260, 268, 355 A.2d 11 (1974).

*what he reasonably believes* to be the use or imminent use of physical force, and he may use such degree of force *which he reasonably believes* to be necessary for such purpose . . . ." (Emphasis added.) "The statute focuses on the person . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact. This subsection also makes clear that such a person may not use 'deadly physical force' unless he *reasonably* believes that the other person is either 'using or about to use deadly physical force' or is 'inflicting or about to inflict great bodily harm.' This statutory emphasis upon the defendant further demonstrates the function of the jury in their evaluation of the self-defense claim." *State* v. *Corchado,* supra, 663.[13]

General Statutes § 53a-19 (c) provides that "[n]otwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) *with intent* to cause physical injury or death to another per-

---

[13] Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force *if* he reasonably believes both that his attacker is using or about to use deadly force against him *and* that deadly force is necessary to repel such attack. *State* v. *Corchado,* 188 Conn. 653, 663, 453 A.2d 427 (1982). Generally, a killing after the aggressor has been rendered harmless and the danger has ceased to exist cannot be justified as a "reasonable belief" within the meaning of § 53a-19. Accord 2 Wharton, Criminal Law (14th Ed. Torcia) § 125.

The "heat of passion" principle urged by the defendant entitles a defendant claiming self-defense to use excessive force that follows closely upon any incapacitating force as long as the defendant believes that he is fighting for his life. *Brown* v. *United States,* 256 U.S. 335, 344, 41 S. Ct. 501, 65 L. Ed. 961 (1921); *Perry* v. *United States,* 422 F.2d 697 (D.C. Cir. 1969); *Inge* v. *United States,* 356 F.2d 345 (D.C. Cir. 1966); *Commonwealth* v. *Fisher,* 491 Pa. 231, 420 A.2d 427 (1980). The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. We, therefore, reject the "heat of passion" principle as claimed by the defendant. See *State* v. *Shaw,* 185 Conn. 372, 383, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982).

son, he *provokes* the use of physical force by such other person, or (2) he is the *initial aggressor* . . . ." (Emphasis added.) See *State* v. *Corchado,* supra.

A review of the record shows that the trial court's instruction to the jury on self-defense, read as a whole, was not erroneous. The court thoroughly instructed the jury that the state had to carry the burden of disproving the defense beyond a reasonable doubt. See General Statutes § 53a-12 (a). The jury was also instructed that the defendant could show, through evidence of the violent character of the victims, that they were in fact the aggressors, that the defendant had a reasonable belief that his life was imperiled by the victims, and that "his consequent state of mind as to the necessity of defending himself" led to "the means justifiably to be taken to do so." See *State* v. *Corchado,* supra, 663; *State* v. *Miranda,* 176 Conn. 107, 109–11, 405 A.2d 622 (1978); *State* v. *Croom,* 166 Conn. 226, 229, 348 A.2d 556 (1974). The court also recited almost verbatim the test of General Statutes § 53a-19 (a).[14] The court then charged the jury, in effect, that the defendant's use of the iron pipe to knock down an aggressor swinging a machete would be reasonable force.[15] The court then instructed the jury that self-defense was not justified if the defendant provoked the attack or was the aggressor; see General Statutes § 53a-19 (c); or if he could

---

[14] The court instructed the jury: "Now, a person is justified in using reasonable force upon another person to defend himself from what he reasonably believes to be the use or eminent [sic] use of physical force. He may use such degree of force which he reasonably believes to be necessary for such purpose, except that deadly physical force may not be used unless the [actor] reasonably—the actor, being the defendant, reasonably believes that such person, being the victim, is using or about to use deadly force or inflicting or about to inflict great bodily harm." See footnote 1, supra.

[15] The jury was also instructed to determine, however, whether the defendant still reasonably believed physical force would be used against him, in light of testimony by the defendant's daughter that, after Luis Martinez hit him with the machete, the defendant ran to the rear of the truck whereby Luis just laughed.

have avoided the use of deadly force with complete safety by retreating. See General Statutes § 53a-19 (b); see generally *State* v. *Shaw,* 185 Conn. 372, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982).

The court went on to instruct the jury that if the blow that incapacitated either victim was found to be a "death blow," then the jury "would have to find justification," but if "you find that the first blow, or the blow that incapacitated either victim or both, did not, in fact, kill them, then, of course, the defendant would not be justified, after they were incapacitated, to continue to beat them." It is only this portion of the court's instructions which the defendant challenges on appeal.

Read as a whole, the trial court's instruction on self-defense was in accordance with General Statutes § 53a-19 and presented the case to the jury in a manner so that no injustice would result.[16] *State* v. *Maturo,* supra, 599. A review of the record before us establishes that the defendant, by his own admission, had challenged Luis to a fight and that the victims fell to the ground after the first blow struck to each of them. The defendant nevertheless continued to beat them with the iron pipe. There was evidence that the beating continued for approximately three to five minutes. This was corroborated by the photographic evidence and the testimony of the chief medical examiner. Moreover, that testimony also indicated that the first blow struck to each victim probably was not fatal. The trial court's instructions on self-defense made it quite clear that the determination of reasonableness was based upon the perception of the defendant. Our examination of the

---

[16] By contrast, we have found that a jury charge on self-defense to the effect that the defendant must also have been without fault "blunt[ed] to the point of reversible error those provisions of § 53a-19 critically significant on the law and to the evidence." *State* v. *Corchado,* 188 Conn. 653, 663, 453 A.2d 427 (1982).

charge as a whole makes it evident that the court adequately instructed the jury that it must decide whether the defendant's perception was reasonable in making its determination of whether, after striking what was the incapacitating blow on each victim, the defendant believed that he had sufficiently repelled their attack on him. The jury could have reasonably concluded that the defendant did not reasonably believe that the degree of deadly force he exercised, in continuing to beat the victims in the manner established by the evidence, was necessary under the circumstances to thwart any immediate attacks from either or both of the victims. In this case, the self-defense instructions to the jury were " 'correct in the law, adapted to the issues and sufficient to guide the jury.' *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980)." *State* v. *Shaw,* supra, 383.

There is no error.

In this opinion the other judges concurred.