[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On October 11, 1989, an unusual confluence of dangerous events, untimely coincidences and all too human error combined to produce this unfortunate case. The essential claim of the plaintiff, Robert Rydingsward, is that certain unnamed Hartford police officers used excessive force in arresting him. After carefully considering this matter, I have concluded that the degree of force used by the arresting officers was not excessive given what they mistakenly but reasonably believed to be the volatile and dangerous state of affairs facing them and the threat posed to public safety. I therefore find for the defendants.
Before discussing the legal and factual issues raised in this singular case, a number of procedural matters must first be addressed.
PROCEDURAL BACKGROUND
The complaint initiating this action was filed on October 23, 1991. The case was subsequently removed to the United States District Court for the District of Connecticut, but was subsequently remanded back to this court in May, 1993.
At the time of the trial, the operative complaint was an Amended Complaint dated March 28, 1996. Subsequently, after the first portion of the trial was completed, plaintiff filed an Amended Complaint dated May 22, 1996, which essentially reiterated the claims made in the March 28, 1996, complaint, and corrected what plaintiff referred to as a scrivener's error.
In the May 22, 1996, complaint, the plaintiff raised numerous claims. In the First Count, he alleges in substance that Dennis Sikoski and various other "John Doe" Hartford police officers wantonly and recklessly assaulted and battered him using "excessive, unjustified and unnecessary force" while arresting him at approximately 4 p.m. on October 11, 1989, on Capen Street in Hartford, causing injury. The First Count alleges that the "John Doe" officers kicked the plaintiff in the side of the face and the head and struck him in the back with one of the officers' knees while plaintiff was handcuffed and held at gunpoint. In the Second Count, plaintiff alleges CT Page 5578-I that Dennis Sikoski and various other "John Doe" Hartford police officers negligently assaulted and battered him, causing injury. The Third Count, brought against Hartford Police Chief Ronald Loranger and the City of Hartford, alleges that Loranger and the City were negligent in that they inadequately trained the arresting officers in the need to avoid the use of excessive force in making arrests. The Fourth Count alleges that the officers involved in the incident were acting within the scope of their employment with the City of Hartford and that notice of the action was given to the City pursuant to Connecticut General Statutes Section7-465, while the Fifth Count makes similar allegations with respect to Chief Loranger. The Sixth Count alleges that the actions of Dennis Sikoski and the "John Doe" officers violated Article 1, Sections 1, 7, 8, 9, 10 and 20 of the Connecticut Constitution. The Seventh Count alleges that the actions of Chief Loranger and the City in failing to provide adequate training also violate these provisions of the Connecticut Constitution.[1]
In their answer of April 17, 1996, defendants' deny all essential allegations of plaintiff's complaint, thereby denying that they acted wantonly, recklessly, or negligently, and denying that excessive force was used on Mr. Rydingsward. Defendants also raise four special defense. The First Special Defense alleges, in substance, that if plaintiff was injured, any injury was a result of his own negligence in that he had displayed a handgun thereby creating a risk of alarm to the public. The Second Special Defense alleges, in substance, that the police officers used an amount of force that was reasonable under the circumstances existing at the time and place of the arrest. The Third Special Defense is that defendants are immune from suit. The Fourth Special Defense is that the action is barred by the applicable statute of limitations. Plaintiff denies all of the allegations in all of defendants' special defenses.
The first trial days were held in this matter on April 16, April 17, and April 23, 1996. Further testimony was taken as to limited issues on August 19, 1996.
On the first day of trial, defendants attempted to file a Motion for Summary Judgment dated April 16, 1996, requesting that the court grant summary judgment as to the "John Doe" officers named in the First and Second Counts. In substance, defendants CT Page 5578-J wished to argue, citing numerous cases, that Connecticut laws and court rules do not allow cases to be brought against "John Doe" defendants. However, the court refused to accept the filing, noting that defendants had failed to comply with Practice Book Section 379, which requires the court to grant a party permission to file such a motion after a case has been claimed for trial. Defendant was invited to file a motion for permission to file the summary judgment motion, which defendant did on April 17, 1996. In the motion for permission, defendants argue that the filing of the motion "will not prejudice the plaintiff or delay the proceedings."
Notwithstanding the fact that defendants' argument have merit insofar as the case law suggests that there is a lack of authority in Connecticut for suing "John Doe" defendants, see, e.g., Kerr v. John Doe, 11 Conn. L.Rptr. 375, 376 (Conn.Super. 1994), I decline to consider the substantive issues raised in the Motion for Summary Judgment dated April 16, 1996. In my view, the issues raised in the motion could and should have been raised prior to trial, not on the first day of trial.
TRIAL TESTIMONY AND EVIDENCE
The following is a summary of the testimony of the witnesses who testified at the trial, taken from notes of their testimony. Because of the fact-specific nature of the findings which must be made, and the unusual nature of this case, this review of the testimony is somewhat extended.
The plaintiff, 51 year-old Robert Rydingsward, testified. A short, heavyset man, he stated that he worked as an auto mechanic and that he was the owner of a four-family apartment on Capen Street with a bar on the first floor. He described the area as a "high crime neighborhood" which had experienced break-ins and shootings, and testified that the bar had been robbed. Because he kept the proceeds from the bar at the bar, and in light of the significant crime in the area, he had applied for and obtained a pistol permit and had obtained a pistol which he sometimes carried in his back pocket or pants. He described the pistol as a .38 snub nose.
On the date in question, Mr. Rydingsward testified that he received a call from a friend, Alvin Scruse, informing him that his building was on fire. Upon receiving this news, Mr. CT Page 5578-K Rydingsward drove his car to Capen and Vine. He wanted to enter the building to retrieve his bar receipts, but he was told by someone from the fire marshal's office that he could not enter the building. He testified that approximately 50 people were congregated at the location. He testified that as he stood there, two vehicles went by and shots were fired, causing police who were already present at the scene to jump into cruisers and drive after the cars. He stated there was a lot of shooting, gunfire, and a chase, which he witnessed. Concerned that he could himself be in harms's way, he ran back to his car where he had left his pistol on the floor, and put it into his right pocket. He had his pistol permit with him. He crossed the street and stood for approximately five minutes waiting to be let into the building. Mr. Scruse was present.
All of a sudden, he saw a police cruiser arrive and four to five guys approached and "threw him down." No-one said anything to him before knocking him down, and he had no opportunity to break his fall. Mr. Rydingsward testified that one of the officers put a gun to his head, that someone stepped on his back, and that someone kicked him on the side of his face. He testified that he was handcuffed and kicked at the same time, and that one of his teeth broke. See Plaintiff's Exhibit 3, photo of plaintiff's mouth showing missing tooth. He testified that the police told him to get up, but that he could not, so he was "yanked up." He said that he told the police that he was the landlord of the building that had been on fire, but that the police refused to listen. He told the police two or three times, he testified, that he had a permit, but was arrested anyway. Only later, he said, did they look at the permit. At some point, he testified, a second batch of police arrived. He was handcuffed for about 45 minutes, approximately 30 minutes of which was spent in the back of a police cruiser. He testified that the handcuffs were on too tight, injuring him. See Plaintiff's Exhibits 1 and 2. He was subsequently charged with breach of peace, carrying a pistol without a permit, and reckless endangerment, he believed. The charges were ultimately dismissed.
He testified further that he was unable to identify any of the police officers who forced him down. However, he believed that defendant Dennis Sikoski had handcuffed him, and helped yank him off the ground and place him into the police cruiser. He did CT Page 5578-L not know if Officer Sikoski was among those who had initially taken him down.
Mr. Rydingsward claimed that his tooth was broken as a result of the incident, requiring dental treatment. He also claimed that his back was injured, requiring trips to a doctor. See Plaintiff's Exhibits 6, 7 and 11. As of the time of trial, Mr. Rydingsward's tooth was still missing because, he testified, he could not afford a replacement. Mr. Rydingsward claimed special damages relating to the claim of damage to his tooth in the amount of $948.70, according to the May 13, 1996, Trial Brief filed by his counsel, and claimed as well as other damages for pain and suffering, mental anguish, and punitive damages.
Alvin Scruse, a friend of Mr. Rydingsward, also testified. Mr. Scruse, an army veteran, stated that he and Mr. Rydingsward went down to the scene of the fire together on the night in question. He testified that he saw shots being fired and ducked into a hallway when that occurred. He observed Rydingsward go to his car to retrieve his pistol, and watched Rydingsward walk back to the scene of the fire, putting the gun in his right pocket. Mr. Scruse said that the plaintiff had not waived the gun around as he went from the car back to the scene of the fire. Mr. Scruse testified that he observed four to five police officers tackle Rydingsward with a lot of force from behind without warning, one officer kicking him in the side, one in the face, and one pressuring him in the knee, and observed Rydingsward being handcuffed by Officer Sikoski. He did not observe Officer Sikoski hit or step on the plaintiff. He said that he observed Mr. Rydingsward's face hit the sidewalk. Mr. Scruse estimated that between five and ten minutes had passed between the time the shots were fired and the time Mr. Rydingsward returned to the curb at the scene of the fire, at which time he was tackled. Mr. Scruse testified that he told the police that plaintiff was the owner of the bar and that he had a gun permit for the gun, which had been seized. Mr. Scruse said that he was told by police that he would be arrested if he did not leave. While he was sitting in the police cruiser, Scruse testified, Rydingsward showed him the broken tooth. Scruse also observed blood on the side of Rydingsward's mouth and small bruises on both sides of Rydingsward's face, on the upper cheeks. Mr. Scruse also testified that he saw an ambulance parked nearby Capen and Vine Streets, where the incident occurred. He heard on the ambulance radio that a man with a gun had been spotted in the area. CT Page 5578-M
Dennis Sikoski, a named defendant, testified. As of October 11, 1989, he had been on the force for one year. In 1995, he was promoted to detective. He had had prior military police training. He was the arresting officer in the case and filled out portions of the incident report relating to it. That report lists none of the names of the officers involved in the report.
Detective Sikoski said that he did not himself handcuff Mr. Rydingsward, but assisted in the handcuffing of him. Along with another officer, he stated, he did a patdown search of plaintiff and removed a pistol from his back pocket. The pistol that was removed was a .357 magnum, not a .38 revolver, he testified. A total of three to seven officers were involved in the Rydingsward incident in toto, he said. When he arrived at the scene, officers were already in the process of handcuffing plaintiff.
Detective Sikoski testified that he was riding in his cruiser when he heard over the police radio that two ambulance attendants — whom he characterized as credible witnesses — had reported that a man had been reported with a gun in the vicinity of the shooting incident had been seen at Vine and Capen Streets, and that as a consequence, he proceeded there to assist. Prior to his arrival, he had information that shots had been fired in an incident and that someone with a gun had been seen in the vicinity. When he arrived, he saw the other officers bring plaintiff down, one officer on each side. He said that the officers who brought him down were "not rough." They secured his arms so that he could not reach for his weapon. Detective Sikoski testified that Mr. Rydingsward had no visible injuries when he was arrested. He testified that he felt threatened until he knew that the gun in Rydingsward's possession had been secured. Detective Sikoski took an oral statement from the ambulance attendants after the incident, who told him that they had been a man in possession of a gun and that he had been "waiving it around." Only after the incident, was he told that the man with the gun had reportedly been "waiving it around." He also interviewed the plaintiff, who told him that he had walked across the street with the pistol by his side.
Detective Sikoski said that he arrested Mr. Rydingsward because he had been observed carrying an unconcealed weapon, which had caused alarm in the community. He was handcuffed to protect the officers present and the public. Detective Sikoski stated that he did not see anyone kick, step on, harm CT Page 5578-N or mistreat Mr. Rydingsward or point a gun at his head. When the officers who had been involved in the car chase returned, Detective Sikoski learned that Rydingsward had not been involved in the shooting incident. Detective Sikoski said that plaintiff was handcuffed behind the back at the narrow part of the wrist, and that he complained that the handcuffs were too tight. Approximately 15-20 minutes after this complaint, Detective Sikoski determined that plaintiff indeed did possess a pistol permit and had not been involved in the shooting incident, and removed the handcuffs. Detective Sikoski said that in hindsight, the incident had not been viewed as a serious one because it turned out to essentially be a breach of peace, which accounted for the relative lack of detail in the report.
Detective Sikoski said that he had received training as to how much force was appropriate to use when arresting someone who is not resisting arrest. If an arrestee is known to possess a weapon, he testified, it was appropriate to use that degree of force necessary to secure and detain him. Given all the circumstances then believed to be present — shots having been fired, a car chase having occurred — it would only take a second for someone to pull a gun and shoot a police officer or an innocent bystander, he said. When information exists indicating that an armed suspect may have fired shots, it is important to secure him as soon as possible, he testified. It is impossible, he stated, to know the state of mind of an armed person.
Jose Schaffino, a cause and origin investigator with the city fire marshal's office, testified. He was present at Vine and Capen Streets on the night of the incident, having responded as part of an arson response. After the fire was extinguished, he testified, he had been interviewing the plaintiff for approximately five minutes, when he saw "a blur of blue coming out of nowhere." The "blur of blue" was the police heading toward Mr. Rydingsward. The police were "very rapid" in their approach to plaintiff, he stated. Mr. Schaffino testified that "two or more" police "took him down NFL style. It was a blind-side tackle. . . . The takedown on Capen Street was tough. It was brutal." He observed Mr. Rydingsward's face hit the pavement, but saw no blood. During his testimony, Mr. Schaffino indicated significant irritation that the police had interfered with his investigation. When he observed these events, Mr. Schaffino said, he did not know that Mr. Rydingsward had a gun. His view was that Rydingsward did not pose a threat to anyone. The gun that police CT Page 5578-O seized was a .357 magnum. At the time of the incident, he said, Mr. Rydingsward was "dirty and greasy" from work and had approximately three days of beard growth. Mr. Schaffino was clear that he did not observe any officer kick plaintiff, or step on plaintiff, or pull a gun on him. Nor did he observe any officer engage in any violent behavior after the takedown. One officer, he recalled, "efficiently cuffed" plaintiff. There were children and adults in the area when the incident occurred, he stated. Mr. Schaffino testified that he was wearing his uniform when the above-described events occurred.
Gerald Weis, who was working as a paramedic with L M Ambulance Company on October 11, 1989, testified. His partner was Kelly M. Kraynak. He responded to information that there was a structural fire at Capen and Vine. When he arrived, he begun talking with police officers at the scene.
"We heard three pops," said Mr. Weis. He thought they were gunshots. They came from the opposite side of the street on Vine and Capen. The officers on the scene, Mr. Weis testified, got in their cruiser and followed a car believed to be involved in the shooting.
He then noticed a man talking to someone. The man had a gun in his right hand, moving it back and forth, "sort of waiving it." He saw the man with the gun approximately five minutes after he had heard the three popping sounds. He saw the man with the gun put the gun down by his side, still holding it, and saw him walking with it. He then observed him put the gun in his waistband or back pocket. Mr. Weis testified that he observed the man with the gun waiving the gun from about 65-70 feet away. He and his partner contacted the police and gave "step for step information" to the police of exactly what they had observed. About three to four minutes later, Mr. Weis testified, a police car arrived. Two officer emerged from the vehicle. One proceeded to plaintiff's left side and one proceeded to his right side. The officer on the left, Mr. Weis recalled, grabbed plaintiff's wrist and forced him to the ground. The other officer, he recollected, appeared to have plaintiff's right hand and helped to force him down onto the ground. The police had no guns drawn, did not kick or step on plaintiff, and did not smash his face into the concrete. Mr. Weis testified that he was sure that only two officers were involved in forcing Mr. Rydingsward down, and that the officers did not run before CT Page 5578-P taking him down and that he was not tackled. The takedown, he said, was "not brutal" but "not gentle" either. He observed these events clearly from about 90 feet away. Mr. Weis stated that Detective Sikoski was not among the officers who forced plaintiff to the ground. He saw no visible signs of injury to Mr. Rydingsward. He did not recollect Jose Schaffino as being in uniform.
Kelly M. Kraynak testified. A police officer with 6 1/2 years of experience at the time of the trial, she had been working with L M Ambulance on October 11, 1989, as an emergency medical technician. Her partner had been Gary Weis. She also testified that she heard several gunshots when she and her partner were at the scene. After hearing the gunshots, she and Weis went back to their ambulance, which was across the street, for safety. She observed some commotion and then saw a man "waiving around" a firearm at chest level from a distance of about 20-25 yards. She saw this clearly and was "alarmed" by it. The man displayed the gun openly at his side. She observed children near him playing, and other persons, within about 15 yards distance of where he was. The time that elapsed between hearing the shots and seeing the man with the gun was "only a couple of minutes" she recalled. She immediately got on the Hartford Police ambulance radio and requested police assistance. She described what she had seen and gave the dispatcher a full description. The police arrived at the scene within five minutes. With a clear, unobstructed view, she testified, she observed the responding police officers approach the plaintiff, "walking quickly" from both sides, one from the north and one from the south. They were walking briskly, but not running. She recalled that they appeared to be talking to plaintiff. She observed the plaintiff stiffen up as the officers on each side of him grabbed an arm. He was forced to the ground, but not tackled. She did not see any officer kick plaintiff on any part of his body, smash his face on the ground, or pull a gun on him. She observed no visible signs of injury. She did not recall Jose Schaffino as being uniformed.
Officer Deborah Thomas, employed by the Hartford Police Department's booking division, testified. She handled the booking of plaintiff following his arrest. She testified that the booking division will not accept anyone with an injury because they don't wish to face legal claims that the injury occurred in the booking facility. She testified concerning Defendant's Exhibit B, an FAF booking report, which has a block for "incoming injuries." If a person brought into the booking facility has injuries, she stated, CT Page 5578-Q this block must be filled in. She failed to note that plaintiff had any injuries. She also testified that she took a picture of plaintiff when he was booked. Defendant's Exhibits C and D. The photo is taken as an arrestee is brought in. The photo did not reveal any visible injuries.
At no time was evidence presented indicating that police sticks were used, or that plaintiff was maliciously or sadistically struck or harmed. Nor was there any suggestion that the arrest was actuated by any ill will or animus, or that plaintiff was verbally abused.
On August 19, 1996, the court permitted additional testimony to be presented, in the interests of justice, with respect to the issues of whether notice had been given to the City of Hartford pursuant to Connecticut General Statutes Section 7-465, and with respect to the issue of whether the case had been brought within the two-year statute of limitations.[2]
DISCUSSION OF FACTS AND APPLICABLE LEGAL PRINCIPLES
This case provides a pure illustration of a principle familiar to all trial lawyers and judges: the testimony of different witnesses to an event can dramatically differ depending on their vantage point, their role in the events described, their interest in the outcome, the time that has transpired between the event and their testimony about it, the precise language they use in describing what occurred, and numerous other factors. In this case, there are numerous minor and major discrepancies concerning many details of what occurred on October 11, 1989. For example, how many officers were involved in the incident and precisely what they did is disputed. The testimony differs as to whether Officer Schaffino was uniformed or not. What Mr. Rydingsward did, and whether he was injured as a consequence, is also not entirely clear. Having heard and observed all of the witnesses testify, I am convinced that no witness is consciously or intentionally misrepresenting what they perceived to have occurred that day.
Notwithstanding the vagaries of memory and perception concerning an incident which occurred almost seven years ago, the law places the burden of proving his claims by a preponderance of the evidence squarely on the plaintiff. Vigorito v. Allard,143 Conn. 70, 71 (1955). In this case, therefore, plaintiff has the CT Page 5578-R burden of proving the allegations that the police officers involved used excessive force and acted negligently in effectuating his arrest pursuant to Counts One and Two.
I have concluded that in all likelihood, Mr. Rydingsward did display his gun — a .357 magnum, not a .38 snub nose — as he walked across the street back to the scene of the incident, in a manner that appeared to have created significant cause for concern. Both Mr. Weis and Officer Kraynak testified to that, and I credit their testimony. I have concluded that an unknown number of "John Doe" officers — perhaps more than two aggressively and firmly forced Mr. Rydingsward down to the ground when they seized him and that they did so without warning to him. I have concluded that plaintiff has failed to prove by a preponderance of the evidence that any unnecessary force was used to subdue him, although it is quite clear that an appreciable degree of force was used to bring him down, and render him incapable of resisting, as he was being subdued. Even Mr. Schaffino, who described the takedown as being "brutal" insofar as it resembled a flying football tackle, did not suggest that unnecessary force was used after plaintiff was brought down. I conclude as well that Detective Sikoski assisted in subduing and handcuffing Mr. Rydingsward, but that there is no credible evidence that he used excessive or unnecessary force.[3] I accept and credit Mr. Scruse's testimony that plaintiff showed him an injury to his tooth which he unfortunately sustained as a result of the arrest. The evidence suggests — though it is by no means free from ambiguity — that plaintiff in all likelihood injured his tooth when he was knocked down. I conclude also that Officer Sikoski released Mr. Rydingsward from the handcuffs, after examining the pistol permit, as soon as sufficient calm had been restored to do so safely.
The issue of whether excessive force has been used in effectuating an arrest is a question of fact to be decided by the finder of fact. Graham v. Connor, 490 U.S. 386, 388
(1989). Applying the above findings of fact to the applicable law, in light of all of the evidence and reasonable inferences which can be drawn from it, I find that plaintiff has failed to prove the allegations set out in the First Count and the Second Count by a preponderance of the evidence. To state it otherwise, I find that the degree of force used by the "John Doe" officers was reasonable in light of the circumstances that they believed to have existed, including the threat to CT Page 5578-S their own safety and to the safety of the public.[4]
The operative statute relating to the use of force by police is General Statutes Section 53a-22, Use of Physical Force in Making Arrest or Preventing Escape. This states in relevant part that:
 (a) For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense. If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of physical force to make an arrest or to prevent an escape from custody . . .
 (b) Except as provided in subsection (a) of this section, a peace officer or authorized official of the department of correction or the Board of Parole is justified in using physical force upon another person when and to the extent that he reasonably believes such to be necessary to (1) Effect an arrest or prevent the escape from custody of a person whom he reasonably believes to have committed an offense, unless he knows that the arrest or custody is unauthorized; or (2) defend himself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape. (Emphasis added)
In subduing a suspect, police officers may properly use whatever force is necessary, so long as it is no more than is necessary under all the circumstances. Lantine v. McAvoy,105 Conn. 528 (1927). In Martyn v. Donlin, 151 Conn. 402, 411
(1964), our Supreme Court stated that: "Under our rule, in effecting a legal arrest, the arresting officer may . . . use such force as he reasonably believes to be necessary, under all the circumstances surrounding its use, to accomplish that purpose, that is, to effect the arrest and prevent an escape. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."Graham v. Connor, supra, at 396. Defendants argue that the general rule in Connecticut appears to somewhat mix the CT Page 5578-T subjective perceptions of the officers making the arrest and the objective standard of reasonableness traditionally present in tort law. Defendants' Trial Memorandum of June 7, 1996, at page 28. Cf. the "subjective-objective" test for the degree of force in cases involving self-defense. State v. DeJesus,194 Conn. 376, 388-90 (1984).
While our Supreme Court has had few occasions to discuss this issue in depth, in the case of Finnegan v. Fountain, 915 F.2d 817,823 (2d Cir. 1990), the Second Circuit Court of Appeals stated as follows with respect to claims under the United States Constitution:
 To establish a Fourth Amendment excessive force claim, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, `objectively unreasonable' under Fourth Amendment standards . . . The reasonableness of the force used is `judged from the perspective of a reasonable officer on the scene' and takes into account factors such as `the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'
See also 5 Am.Jur.2d, "Arrest," Section 106, which states as follows:
 The reasonableness of a particular use of force by a police officer making an arrest is judged from the perspective of a reasonable officer on the scene, rather than by hindsight. All circumstances must be considered, including the severity of the offense, the immediate threat posed by the suspect, and the suspect's attempts to resist or flee. The determination must be made on a case-by-case basis under the Fourth Amendment `objective reasonableness' standard, which requires that the nature and quality of the intrusion on the arrestee's interests be balanced against the governmental interests which are alleged to justify the use of force.
**********
Having evaluated the credible testimony and reasonable inferences to be drawn from it, the Court concludes that under the circumstances of this case, the reliance by the police on the CT Page 5578-U information provided by the ambulance attendants was reasonable. In this incident, the ambulance attendants were motivated by the best of motives — the desire to assist the police in locating a suspected perpetrator, believed to possess a weapon, in the proximity of children and other citizens. The fact that Mr. Rydingsward turned out to uninvolved in criminal activity rendered their conduct no less laudable.
Even though the "John Doe" officers did not testify, the evidence and reasonable inferences drawn from the evidence lead me to conclude that the "John Doe" officers were facing a volatile situation which they reasonably believed to be fraught with danger to the public, including children in the area, and themselves. Numerous factors — the fire, the firing of shots, the car chase, the presence of a man reported to have been seen carrying a gun, the crowd, including children — all combined in a relatively short space of time to create an atmosphere of uncertainty. Of course, police officers have duty to ascertain facts when possible before applying force and making an arrest. State v. Walker,34 Conn. Sup. 548 (1976). And police officers must never be excused if through negligence or animus, they use excessive force. But given the unusual circumstances of this case, had the police paused to politely question plaintiff, they would have exposed the citizenry in the area and themselves to danger, given what they reasonably believed to be the situation facing them and the possibility that Mr. Rydingsward posed an imminent threat to the public. Had the police failed to act quickly and decisively, they would have breached their duty to the public to provide protection when dangerous circumstances arise. Shore v. Stonington, 187 Conn. 147, 152
(1982). That they turned out to be wrong, in reasonable reliance on information provided in good faith by credible sources, renders this no less true.
Given the circumstances of this case, I cannot agree with defendants' argument that plaintiff was responsible for what occurred. Nonetheless, his open carrying of the gun under the circumstances which existed did, inadvertently, contribute to and exacerbate the volatile situation which existed and did, I conclude, provide justification for his arrest, mistaken though it turned out to be. I also cannot agree with plaintiff's claim that because Mr. Schaffino testified that he was in uniform — a fact disputed by defendants' witnesses — the actions of the police were unreasonable. Even assuming that Mr. Schaffino was in CT Page 5578-V uniform, the evidence does not make it clear if the "John Doe" officers saw Mr. Schaffino, saw that he was uniformed, or recognized who he was.
Consequently, the court concludes that the "John Doe" officers' use of force was justified under Section 53a-22 (b)(1) and relevant case law in that they were effectuating the arrest of someone whom they reasonably believed to have committed an offense.
I further conclude that under the particular facts and circumstances of this case, the force utilized by the police was applied in good faith in an effort to maintain order and safeguard the public and the police, and not maliciously or sadistically to cause harm; that the unusual circumstances present justified the use of force; and that while force was applied in a significant degree and was aggressively applied, it was not excessive given all of the facts and circumstances present and the exigencies of the moment. Graham v. Connor,490 U.S. 386 (1989). I conclude as well that the evidence presented at trial does not justify the conclusion that the handcuffs were applied in an unreasonable manner and that handcuffing was necessary, for a limited period of time, given all the circumstances. Soares v. State of Connecticut,8 F.3d 917 (2d Cir. 1993).
Our legal system provides a framework within which parties seek to assess fault, apportion blame, and seek redress for grievances. Certainly, in circumstances such as those present here, it is understandable that Mr. Rydingsward feels aggrieved and seeks recompense for whatever injuries he may have suffered. It is likewise understandable that, from his perspective, he believes he was injured through no fault of his own. But it is worth remembering that on occasion, unusual circumstances combine with random events to produce unlikely results for which no one is legally at fault. I believe this case falls within that category.
SUMMARY AND CONCLUSION
Given all of the circumstances present in this anomalous case, considering all the evidence and the reasonable inferences drawn from it, I have concluded for the reasons stated above that plaintiff has failed to prove his claims by a preponderance of the evidence, notwithstanding the unfortunate injury he suffered. CT Page 5578-W For the reasons stated, judgment may enter for all defendants on all counts of the complaint.
Douglas S. Lavine, Judge, Superior Court